IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

ANN MARIE ROSE BAKER, M.D.,
     PLAINTIFF,

V.                               NO. 4:08-CV-1908

UNIVERSITY OF TEXAS HEALTH SCIENCE
CENTER – HOUSTON AND THE UNIVERSITY OF
TEXAS SYSTEM MEDICAL FOUNDATION,
     DEFENDANTS.

### PLAINTIFF, ANN MARIE BAKER, M.D.'S, RESPONSE TO DEFENDANTS' MOTION TO DISMISS

    Plaintiff file this her Response to Defendants,

University of Texas Health Science Center – Houston and

University of Texas System Medical Foundation's, Motion to

Dismiss for Failure to State a Claim upon Which Relief May

be Granted (doc. 12), and would show unto this Court as

follows:

### I. **Standard for Motion to Dismiss**

    1.   Pursuant to Federal Rule of Civil Procedure 12(b),

dismissal of an action is appropriate whenever the

complaint, on its face, fails to state a claim upon which

relief can be granted.  When considering a motion to

dismiss, the court should construe the allegations in the

complaint liberally and favorably to the pleader, and

accept all well-pleaded facts as true. *Plotkin v. IP Axess Inc.,* 407 F.3d 690, 696 (5th Cir. 2005); *Cornish v. Corr. Servs. Corp.,* 402 F.3d 545, 548 (5th Cir. 2005).

2.  The Court may not look beyond the pleadings in ruling on the motion. *Baker v. Putnal,* 75 F.3d 190, 196 (5th Cir. 1996). Motions to dismiss are disfavored and are rarely granted. *Beanal v. Freeport-McMoran, Inc.,* 197 F.3d 161, 164 (5th Cir. 1999). "The issue at [the motion to dismiss] stage is not whether Plaintiff will prevail, but whether they are entitled to pursue their complaint and offer evidence in support thereof." *Doe v. Hillsboro Indep. Sch. Dist.,* 81 F.3d 1395, 1401 (5th Cir. 1996). Although the court will not accept conclusory allegations or unwarranted deductions of fact as true (*Tuchman v. DSC Communications Corp.,* 14 F.3d 1061, 1067 (5th Cir. 1994)), dismissal is improper "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *See Beanal,* 197 F.3d at 164 (quoting *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957); *see also Cornish,* 402 F.3d at 549.

## II.  Plaintiff's Motion for Leave to Amend her Complaint[1] and Plaintiff's First Amended Complaint.

3.  Defendants in their Motion to Dismiss pursuant to Rule 12(b) of the Federal Rules of Civil Procedure seek dismissal of Plaintiff's Original Complaint.  *See Defendants' Motion to Dismiss*, doc. 12.  Defendant UTHSC-H seeks dismissal on the ground that "Plaintiff's claims against it, violation of Americans with Disability Act, Title I (ADA) are barred by the Eleventh Amendment of the U.S. Constitution."  *Id.* at 1.

4.  Plaintiff's Original Complaint does not identify whether the lawsuit is brought under Title I or Title II of the Americans with Disability Act.  Defendant argues that if the claim is brought under Title I then the Eleventh

---

[1] The Federal Rules of Civil Procedure express a preference for liberally granting leave to amend.  *See* Fed. R. Civ. Pro. 15(a) ("Leave shall be freely given when justice so requires.").  "If the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits.  In the absence of any apparent or declared reason -- such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc. -- the leave sought should, as the rules require, be "freely given."  Of course, the grant or denial of an opportunity to amend is within the discretion of the District Court, but outright refusal to grant the leave without any justifying reason appearing for the denial is not an exercise of discretion; it is merely abuse of that discretion and inconsistent with the spirit of the Federal Rules."  *See Foman v. Davis*, 371 U.S. 178, 182 (1962).

Amendment bars recovery, and cites *Board of Trustees of the University of Alabama v. Garrett*, 531 U.S. 356 (2000).[2]

5.   The proposed Amended Complaint asserts violations language consistent with the underlying tenets of Title I, but makes clear that the accommodation standards of Title II form the underlying basis of the Complaint.[3]

---

[2] In *Garrett*, the Supreme Court explained that "Congress is the final authority as to desirable public policy, but in order to authorize private individuals to recover money damages against the States, there must be a pattern of discrimination b the States which violates the *Fourteenth Amendment*, and the remedy imposed by Congress must be congruent and proportional to the targeted violation. *Id.* at 374. Those requirements are not met here, and to uphold the Act's application to the States would allow Congress to rewrite the *Fourteenth Amendment* law laid down by this Court in *Cleburne.*" *Id.*

[3] § 12112, Discrimination, provides in part:

> (a) General rule. **No covered entity shall discriminate** against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.
>
> (b) Construction. As used in subsection (a), the term "discriminate against a qualified on the basis of disability" includes—
>     (1) limiting, segregating, or classifying a job applicant or employee in a way that adversely affects the opportunities or status of such applicant or employee because of the disability of such applicant or employee;
>     (2) participating in a contractual or other arrangement or relationship that has the effect of subjecting a covered entity's qualified applicant or employee with a disability to the discrimination prohibited by this title (such relationship includes a relationship with an employment or referral agency, labor union, an organization providing fringe benefits to an employee of the covered entity, or an organization providing training and apprenticeship programs);
>     **(3) utilizing standards, criteria, or methods of administration-**
>
> > **(A) that have the effect of discrimination on the basis of disability**; or

6.  Under Title I of the Act (employment), a "covered

entity" means an employer, employment agency, labor

organization, or joint labor-management committee.  42

U.S.C. § 12111(2).

7.  The Supreme Court in *United States v. Georgia*, 546

U.S. 151 (2006), held that Title II of the Americans with

Disabilities Act of 1990 (42 U.S.C. §§ 12131 et seq.),

---

(B) that perpetuate the discrimination of others who are
subject to common administrative control;

   **(4) excluding or otherwise denying equal jobs or benefits** to a
qualified individual because of the known disability of an
individual with whom the qualified individual is known to have a
relationship or association;
   **(5) (A) not making reasonable accommodations to the known
physical or mental limitations of an otherwise qualified
individual with a disability who is an applicant or employee,
unless such covered entity can demonstrate that the accommodation
would impose an undue hardship on the operation of the business
of such covered entity;** or
   **(B) denying employment opportunities to a job applicant or
employee who is an otherwise qualified individual with a
disability, if such denial is based on the need of such covered
entity to make reasonable accommodation to the physical or mental
impairments of the employee or applicant**;
   (6) using qualification standards, employment tests or other
selection criteria that screen out or tend to screen out an
individual with a disability or a class of individuals with
disabilities unless the standard, test or other selection
criteria, as used by the covered entity, is shown to be job-
related for the position in question and is consistent with
business necessity; and
   (7) failing to select and administer tests concerning
employment in the most effective manner to ensure that, when such
test is administered to a job applicant or employee who has a
disability that impairs sensory, manual, or speaking skills, such
test results accurately reflect the skills, aptitude, or whatever
other factor of such applicant or employee that such test
purports to measure, rather than reflecting the impaired sensory,
manual, or speaking skills of such employee or applicant (except
where such skills are the factors that the test purports to
measure).
 …

validly abrogated state sovereign immunity for conduct that actually violated the Federal Constitution's *Fourteenth Amendment*.[4]  *United States v. Georgia* was brought under Title II.

8.  Title II provides:

§ 12131. Definition.  As used in this title:

(1) Public entity.  The term "public entity" means—

(A) **any State or local government**;
(B) any department, agency, special purpose district, or other instrumentality of a State or States or local government; and
(C) the National Railroad Passenger Corporation, and any commuter authority (as defined in section 103(8) of the Rail Passenger Service Act [49 USCS § 24102(4)]).

(2) Qualified individual with a disability.  The term "qualified individual with a disability" means an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity.

---

[4]  "This Act", referred to in this section, is Act July 26, 1990, P.L. 101-336, 104 Stat. 327, popularly referred to as the Americans with Disabilities Act of 1990, which appears generally as 42 USCS §§ 12101 et seq.  For full classification, consult USCS Tables volumes.
    "Title IV", referred to in this section, is Title IV of Act July 26, 1990, P.L. 101-336, 104 Stat. 366, which added 47 USCS § 225, among other things.  For full classification of such Title, consult USCS Tables volumes.
    "Title I, II, III, and IV of this Act", referred to in this section, refers to Titles I-IV of Act July 26, 1990, P.L. 101-326, 104 Stat. 330, which appear generally as 42 USCS §§ 12111 et seq.  For full classification of such Titles, consult USCS Tables volumes.

State entities are clearly covered. Section 12132 provides that "no qualified individual with a disability shall by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs or activities of a public entity, or be subjected to discrimination by any such entity." *See generally Powell v. National Bd. of Medical Examiners*, 364 F.3d 79 (2nd Cir. 2004); *see also Weixel v. Board of Education of City of New York*, 287 F.3d 138 (2nd Cir. 2002); *Wong v. Regents of University of California*, 192 F.3d 807 (9th Cir. 1999).

9. Plaintiff's Original Complaint sets out in Paragraph 14 that "[a]ll requests for leave of absence and accommodations are required to be approved by the Program Director."

10. Paragraph 18 references Plaintiff being able to perform the essential functions of her job but having an underlying need for accommodation in light of the weakness associated with her disability. Plaintiff contends in paragraph 19 that when she returned to her duties in September of 2004, the employer verbally acknowledged the accommodations but the acceptance of same was not followed in practice. In *Wong v. Regents of University of California*, *id.* at 816, the Ninth Circuit explained the

difference between reasonable modification and reasonable

accommodation:

> Although Title II of the ADA uses the term
> "reasonable modification" rather "reasonable
> accommodation," these terms do not differ in the
> standard they create. *See* 29 U.S.C. § 794(d)
> (directing that standards used to determine when
> violation of Title I of the ADA has occurred also
> apply to violations of section 794; 42 U.S.C. §
> 12111(8) (defining "qualified individual with a
> disability," against who employer may not
> discriminate under Title I of the ADA, in terms of
> "reasonable accommodation"); *see also Zukle*, 166
> F.3d at 1045, n. 11 (observing that "Title II of
> the ADA was expressly modeled after Section 504 of
> the Rehabilitation Act [29 U.S.C. § 794], and is to
> be interpreted consistently with that provision."
> (*quoting Theriault v. Flynn*, 162 F.3d 46, 48 n. 3
> (1st Cir. 1998))). We will continue the practice
> of using these terms interchangeably.

11. UTHSC-H is a public entity and as such it must

"make reasonable modifications in policies, practices, or

procedures when the modifications are necessary to avoid

discrimination on the basis of disability." *Id.* at 818;

*see also United States v. Georgia*, 546 U.S. 151 (2006)

(holding that Title II of the ADA validly abrogates state

sovereign immunity insofar as the lawsuit addresses conduct

that actually violates the Fourteenth Amendment); *and*

*Tennessee v. Lane*, 541 U.S. 509 (2004) (Title II of the ADA

validly abrogates state sovereign immunity); In context

of Fed. R. Civ. Proc. 12(b), both the Original Complaint

and the proposed Amended Complaint meet the pleading requirements and are sufficient to require denial of the motion.

12.   The Defendants are amenable to suit under Title II, and Plaintiff's Original Complaint and First Amended Complaint allege sufficient facts to withstand dismissal. The United States Court of Appeals for the Fifth Circuit has stated that "to prevail on an ADA claim, a plaintiff must prove that (1) he has a disability; (2) he is qualified for the job; and (3) an adverse employment decision was made solely because of his disability.  To withstand a motion to dismiss, however, the plaintiff need only allege sufficient facts that, if true, would establish a claim for discrimination." *See Turco v. Hoechst Celanese Corp.*, 101 F.3d 1090, 1092 (5th Cir. 1997).

13.   The Plaintiff's First Amended Complaint provides the following additional details, to-wit:

a)   A description of Plaintiff's illness, the treatment Plaintiff was admitted for on June 26, 2004, and treatment available for Guillain-Barré Syndrome generally:

... On June 26, 2004, [Plaintiff] was readmitted
with Guillain-Barré Syndrome[5] for Intravenous
immune globulin (IVIG) therapy.[6]

---

[5] "Guillain-Barré syndrome is a disorder in which the body's immune
system attacks part of the peripheral nervous system.  The first
symptoms of this disorder include varying degrees of weakness or
tingling sensations in the legs.  In many instances, the weakness and
abnormal sensations spread to the arms and upper body.  These symptoms
can increase in intensity until the muscles cannot be used at all and
the patient is almost totally paralyzed.  In these cases, the disorder
is life-threatening and is considered a medical emergency.  The patient
is often put on a respirator to assist with breathing.  Most patients,
however, recover from even the most severe cases of Guillain-Barré
syndrome, although some continue to have some degree of weakness.
Guillain-Barré is called a syndrome rare. ... Guillain-Barré is called a syndrome
rather than a disease because it is not clear that a specific disease-
causing agent is involved. Reflexes such as knee jerks are usually
lost.  Because the signals traveling along the nerve are slower, a
nerve conduction velocity (NCV) test can give a doctor clues to aid the
diagnosis.  The cerebrospinal fluid that bathes the spinal cord and
brain contains more protein than usual, so a physician may decide to
perform a spinal tap." *See NINDS Guillain-Barré Syndrome Information
Page,* National Institutes of Health, National Institute for
Neurological Disorders and Stroke, available at:
http://www.ninds.nih.gov/disorders/gbs/gbs.htm.

[6] "There is no cure for Guillain-Barré syndrome. However, many
treatments are available to help reduce symptoms, treat complications,
and speed up recovery.  When symptoms are severe, the patient will need
to go to the hospital for breathing help, treatment, and physical
therapy.  A method called plasmapheresis is used to clean a person's
blood of proteins called antibodies. Blood is taken from the body,
usually from the arm, pumped into a machine that removes the
antibodies, then sent back into the body.  High-dose immunoglobulin
therapy (IVIG) is another procedure used to reduce the severity and
length of Guillain-Barré symptoms."

Intravenous immune globulin (IVIG) is a blood product administered
intravenously.  It contains the pooled antibodies extracted from the
plasma of over one thousand blood donors.  IVIG's effects last between
two (2) weeks and three (3) months.  It is mainly used as treatment in
three major categories: immune deficiencies, inflammatory and
autoimmune diseases, and acute infections.

"Other treatments are directed at preventing complications.  Blood
thinners may be used to prevent blood clots. If the diaphragm is week,
breathing support or even a breathing tube and ventilator may be
needed. Pain is treated aggressively with anti-inflammatory medicines
and narcotics, if needed.  Proper body positioning or a feeding tube
may be used to prevent choking during feeding if the muscles for
swallowing are weak. *See Guillain-Barré Syndrome*, Northwestern
Memorial Hospital (reviewed June 4, 2008), at: http://www.nmh.org/nmh/

*Plaintiff's First Amended Complaint*, par. 17.

b)  A timeline of Plaintiff's physician requested
accommodations that Defendants agreed to provide,
treatment, progress and setbacks.  The continuous
information from plaintiff's physicians reveals the extent
of Defendants' knowledge and disregard of the nature,
seriousness, and reality of Plaintiff's disability.  The
Amended Complaint provides:

> 20.  Doctors at The Institute of Rehabilitation and
> Research (TIRR), Baylor College of Medicine,
> repeatedly explained to Defendants that Plaintiff's
> condition required energy conservation measures and
> accommodations with work and activities of daily
> living.
>
> 21.  Dr. Kate Hughes, PT, DPT, MS., OCS, Doctor of
> Physical Therapy and Board certified Orthopedic
> Clinical Specialist, TIRR, listed the physical work
> accommodations to include:
>
> > 1. No standing or walking for > 10 min. continuously.
> > 2. Use of a wheelchair at work.
> > 3. No continuous upper extremity activities.  She is able
> >    to check off forms & write short notes, but requires
> >    accommodations for longer notes (i.e. dictation).
> > 4. Requires 15-minute rest breaks every two hours.  She may
> >    use this time to eat snacks, as her energy expenditure
> >    to perform routine task is high.  She requires increased
> >    caloric intake to meet or exceed her energy demands.
> > 5. Limited work day to – 4 hours/day (5 day/week).
> > 6. Must be able to attend medical follow up and
> >    rehabilitation appointments on a regular basis.
>
> 22.  Plaintiff did not return to her residency duties

---

adam/adamency clopedia/HIE Articles/000684.htm; citing *Intravenous*
*immunoglobulin for Guillain-Barré Syndrome*, Hughes RA, Raphael JC, Swan
AV, van Doorn PA. (Cochrane Database System Rev. January 25
2006;(1):CD002063 Review.).

until September 2004; her return was accompanied by
restrictions imposed by her physician. The
restrictions were accepted by the Defendants; however,
as noted herein, the oral and/or written acceptance
was not followed in practice.

23. On November 25, 2004, Plaintiff was admitted to
Montgomery County Memorial Hospital (MCMH) with over-
use nerve re-injury syndrome and for inpatient
rehabilitation.

24. On November 25, 2004, Plaintiff was admitted to
TIRR for extensive inpatient rehabilitation for
Guillain-Barré Syndrome.

25. In April of 2005, Plaintiff began intensive
outpatient therapy through TIRR's Comprehensive Day
Work Program. She returned to residency duties in
July with restrictions which were accepted by Dr.
Sharon Crandell, the Program Director. The
restrictions had been modified due to Plaintiff's
improvements in physical and occupational therapy.

26. Defendants received a Letter of Medical Necessity
dated October 3, 2005, from Dr. Teresa Kaldis, TIRR
Director of Specialty Rehabilitation Program, Co-
Director Post Polio Clinic, and Assistant Professor of
Physical Medical and Rehabilitation, Baylor College of
Medicine, recommending that Plaintiff receive special
accommodations for testing (four (4) days of four (4)
hour testing with a thirty (30) minute break every two
(2) hours).

27. On May 29, 2006, Dr. Hughes provided the
following update on Plaintiff's restrictions to Dr.
Crandell:

    Dr. Baker continues to be limited by severe
    fatigue. This is an extremely common sequela of
    GPS and is well documented in medical literature
    (Corsi and Versino, Gregory et al, Merkies et
    al). Merkies represented that severe fatigue was
    present in most people (`80%) who previously had
    GBS despite normal strength and sensation on

testing.

28.  Dr. Hughes explained that fatigue would be an
issue needing to be managed for the foreseeable
future; and that the already tremendous demands of
residency increase exponentially "when combined with
the serious fatigue of GBS."  She listed the steps
Plaintiff had taken to decrease household activities
and conserve her energy while completing her
residency, and noted that activity outside of work and
home had been minimized.  The requested work
accommodations based on the most recent assessment
were significantly reduced:

   1. No standing or walking for > 20-30 min continuously (maximum
      total of standing/walking 2 hrs/work day).
   2. Use of a wheelchair at work.
   3. Use of dictation, voice recognition software, or a scribe
      to write notes.
   4. Requires 15 min rest/food breaks every 4 hours (requires
      increased caloric intake due to body's high energy
      expenditure, even when function at low level).
   5. Requires greater recovery time after call nights, if not
      possible to obtain at least 4 hrs sleep on call nights.
      Consider designating day after the day after the call night
      as Dr. Baker's day off to allow recovery from fatigue.

29.  In her March 28, 2007, update/accommodations
letter, Dr. Hughes explained: "after approximately
eight months without formal physical therapy from
12/05 to 8/06, Dr. Baker resumed therapy in September
of 2006, subsequent to injuries sustained in an
accident."  Dr. Hughes believed Plaintiff's recovery
was slowed due to her disability.  For example,
Plaintiff continued to have swelling in her left foot
and bilateral lower legs up to her knees despite
repeated MRIs and X-rays revealing no orthopedic
problem responsible for the swelling.

30.  Dr. Hughes noted Plaintiff's significant progress
which had almost eliminated her wheelchair use.
However, upper extremity weakness and fatigue
continued to be problematic.  The only accommodations
requested at that time were "fatigue management
strategies … Rest and caloric intake to meet energy
expenditures … Recovery time after on-call nights is
still necessary, and Dr. Baker needs opportunities to

eat throughout the day.  These accommodations will
help decrease the effects of fatigue on her work
performance."

*Id.* at par. 20-30.

c)    Plaintiff's First Amended Complaint sets out the

legal bases for Plaintiff's claims under Title II:[7]

Title II of the ADA provides, that "no qualified
individual with a disability shall by reason of such
disability, be excluded from participation in or be
denied the benefits of the service, program, or
activities of a public entity, or be subjected to
discrimination by any such entity.  42 U.S.C. § 12132.

A "qualified individual with a disability" is defined
as "an individual with a disability who, with or
without reasonable modifications of rules, policies,
or practices, the removal of architectural,
communication or transportation barriers, or the
provision of auxiliary aids and services, meets the
essential eligibility requirements for the receipt of
services or the participation in programs or
activities provided by a public entity."  42 U.S.C. §
12131(2).

*Amended Complaint*, par. 32-33.

d)    Additional illustrations of the Defendants'

denial of Plaintiff's rights and privileges provided

---

[7] It should be noted that the Amended Complaint also asserts a claim
under the Rehabilitation Act of 1973, 29 USCS § 794.  The
Rehabilitation Act prohibits discrimination under any program or
activity receiving Federal financial assistance against any otherwise
qualified individual with a disability, solely because of his
disability.  29 U.S.C.S. § 794(a).  Section 504's remedies provision,
29 U.S.C. § 794 (a)(2), provides that "the remedies, procedures, and
rights set forth in Title VI of the Civil Rights Act of 1964 shall be
available to any person aggrieved by any act or failure to act by any
recipient of Federal assistance or Federal provider of such assistance
under section 504 of this title".  *See Nieves-Marquez v. Commonwealth
of Puerto Rico*, 353 F.3d 108, LEXIS 26253 **49-50 (1st Cir. 2003).

include:

> On April 21, 2007, Plaintiff was pulled off the
> rotation by the Program Director; Plaintiff was told
> that she was medically incompetent and it was unsafe
> for her to continue. The medically incompetent label
> was applied because Plaintiff sought modification of
> the policies and practices of the institution.
> Specifically, on April 23, 2007, Dr. Crandell wrote a
> note to the file of plaintiff, saying that based on an
> alleged review of Plaintiff's performance with Dr.
> Tsakiri, "Ann Marie is currently functioning at a very
> low level." And "I have placed her [Plaintiff] on
> medical leave of absence with instructions to see
> several professionals."
>
> The several professionals were listed in an email from
> Dr. Crandell the following day, and included Dr.
> Vernon Walling, "a competent Child/Adult Psychiatrist
> who has considerable experience working with patients
> with ADD, … a competent internist to evaluate your
> overall health," and Pam Bass who "is very
> enthusiastic about your seeing Dr. Walling wrt your
> medication." Plaintiff was required to spend the rest
> of the month reading. She would not receive credit
> for passing the month. The email was prefaced: "Dr.
> Barratt has informed me that my expectations for you
> for the rest of this month were not clear. You have
> been relieved of your medical duties at LBJ."
>
> It is Plaintiff's position that pulling Plaintiff off
> the rotation was a continuation of Defendants'
> reaction to Plaintiff's disability and related
> accommodation. In fact, the requirement that
> Plaintiff visit a psychiatrist was tantamount to
> labeling the disability as "defective" and/or "it's
> all in your head."

*Id.* at par. 39-41.

## III. <u>The Lawsuit was Timely Filed.</u>

14. Defendants assert that Plaintiff's claim against

both UTSMF and UTHSC-H should be dismissed because the lawsuit was not timely filed.  It should be noted that the Right to Sue letter was dated February 29, 2009, but possessed a post-mark of March 18, 2008.  The lawsuit was filed on June 16, 2008 – on the 90th day from the post-mark.[8]  Plaintiff received the document on or about March 20, 2008 (*see affidavit of Anthony P. Griffin* under **attachment A** herein).  The lawsuit was timely filed with respect to the ADA claim.

### IV.  The Claim Against both Parties Should Survive.

15.  Defendant contends that the Foundation should be dismissed in this matter because the foundation was not named in the EEOC filing.  A**ttachment B** herein is a copy of a letter from Defendant's representative explaining that the Charge named UTHSC-H as Respondent and that the charge was forwarded the UTSMF office.  The author of the letter writes, "because UTHSC-H did not employ Complainant.  The University of Texas System Medical Foundation employed Complainant, and is the appropriate and proper Respondent

---

[8] Plaintiff requests an additional forty-five(45) days to produce the underlying documents associated with the receipt date.  The information was tendered to Plaintiff's counsel at the initial interview of the client on May 8, 2008.  On September 12, 2008, Hurricane Ike struck the Island, and one-half of the active files in Plaintiff's counsel's office were lost or damaged due to the flood water.  Counsel's office is still restructuring the files and need the additional time.

to this Charge".

16. Plaintiff's Complaint asserts that that the appointment agreement as between Plaintiff and the University of Texas Systems Foundation. The Foundation served as the administrator of the University of Texas System/health Science Center Medical School Affiliated Hospitals Integrated Residency Training Program (*see Plaintiff's Original Complaint*, par. 9; see *Plaintiff's First Amended Complaint*, par. 11). In addition, the Resident Physicians are appointed by UTSMF. *Id.*

17. After the appointment by UTHSC-H, the physician is required to serve at affiliated hospitals and accept the duties and responsibilities and rotation assignments by the Program Director of UTHSC-H, abide by the Rules and Regulations of the Board of Regents of UTSMF/UTHSC-H. *See Original Complaint*, par. 10; *Amended Complaint*, par. 12, 14.

18. UTSMF's documents reveal that it issued paychecks, provided personnel services, and maintained the records surrounding the administration of the program. *See Original Complaint*, par. 11; *Amended Complaint*, par. 13.

19. The physician is then required to follow the policies of UTHSC-H and the retention and termination from

the program is decided by UTHSC-H.  *See Original Complaint*,
par. 12; *Amended Complaint*, par. 14.  In that same context,
the level of responsibility is defined by employees of the
Health Science Center.  *See Original Complaint*, par. 13-15;
*Amended Complaint*, par. 14-17.

20.  Plaintiff asserts that the entities were joint
employers.  Albeit the charge of discrimination named only
UTHSC-H (charge attached under **attachment C**), UTSMF wrote
to convey that Plaintiff was not employed by UTHSC-H and
that the proper party for appearance was UTSMF – the charge
of discrimination was no surprise to Defendants.

21.  In the case of *Tillman v. City of Boaz*, 548 F.2d
592, 1877 LEXIS (5th Cir. 1977), the Fifth Circuit
explained that "[c]harges filed with the EEOC must be
liberally construed because they are made by persons who
are unfamiliar with the technicalities of formal pleadings
and who usually do not have the assistance of an attorney."
*Id.* at 594.  In *Tillman*, the plaintiff, an employee of the
City, send a handwritten charge of discrimination that
stated simply, "I would like to file a claim against the
City of Boaz."  It should be noted that when the lawsuit
was filed, Tillman sued the City of Boaz, the Mayor and
individual city council members.  *Id.*  The Circuit noted

that the letter was sufficient to place the Defendants on
notice. *Id.* In addition, the EEOC investigated the City
and the Mayor. *Id.*

22. In *Smith v. Grattan Family Enterprises*, LEXIS
18954 (E.D. Mich. 2009), the plaintiff brought a claim
under the Americans with Disabilities Act. The Defendant
challenged the amendment to the charge naming it as a party
to the litigation. The district court in addressing the
challenge analyzed the additional party looked to Rule 15:

> Although not controlling here, this conclusion
> comports with Federal Rules of Civil Procedure 15(c)
> (1)(C), which allows an addition of a party to the
> pleadings to relate back if the party (1) was involved
> in the same conduct, transaction, or occurrence as set
> for the original pleading; (2) received notice of the
> action such that it will not be prejudiced in
> defending on the merits and (3) "knew or should have
> known that the action would have been brought against
> it, but for a mistake concerning the proper party's
> identity."

*Id.* at *19.[9]

23. The Second Circuit in *Johnson v. Palmer*, 931 F.2d
203, 1991 LEXIS 7065, *17-18 (2nd Cir. 1991) explained the

---

[9] The district court cited *Budlong v. Laventhol & Horwath*, 51 F.E.P. 783
(M.D. Fla. 1998) (finding that a defendant who was not named on the
EEOC charge but who served as equity partner in the company that was
named, was a proper defendant in the Title VII action because he was
the target of the charge and had actual knowledge that plaintiff was
considering filing a charge), and *Drummer v. DCI Contracting*, 772 F.
Supp. 821, 828 (S.D.N.Y. 1991) (finding that a defendant, who was not
on EEOC charge but who served as president of the company that was
named, was a proper defendant in the Title VII action because his
actual knowledge of the charge could be inferred). *Id.* at *20.

exception to the general rule occurs when there is an

"identity of interest".

> A prerequisite to commencing a Title VII action against
> a defendant is the filing with the EEOC or authorized
> state agency of a complaint naming the defendant.  42
> U.S.C. § 2000e-5(e).  Because these charges generally
> are filed by parties not versed in the vagaries of
> Title VII and its jurisdictional and pleading
> requirements, we have taken a "flexible stance in
> interpreting Title VII's procedural provisions,"
> *Egelston v. State University College at Geneseo*, 535
> F.2d 752, 754, 755 (2d Cir. 1976), so as not to
> frustrate Title VII's remedial goals.  Thus, courts
> have recognized an exception to the general rule that a
> defendant must be named in the EEOC complaint.
> *Eggleston v. Chicago Journeymen Plumbers' Local Union
> No. 130*, 657 F.2d 890, 905-06 (7th Cir. 1981), *cert.
> denied*, 455 U.S. 1017 (1982).  This exception, termed
> the "identity of interest" exception, permits a Title
> VII action to proceed against an unnamed party where
> there is a clear identity of interest between the
> unnamed defendant and the party named in the
> administrative charge. *See, e.g., Romain v. Kurek*, 836
> F.2d 241, 245-46 (6th Cir. 1987) (per curiam); *Glus v.
> G.C. Murphy Co.*, 562 F.2d 880, 888 (3d Cir. 1977);
> *Maturo v. National Graphics, Inc.*, 722 F. Supp. 916,
> 925 (D. Conn. 1989); *Garcia v. Gardner's Nurseries,
> Inc.*, 585 F. Supp. 369, 372 (D. Conn. 1984).

24.  Plaintiff's Complaint before the Court asserts

that the Defendants are joint employers.  The Fifth Circuit

follows the four-factor test adopted by the United States

Supreme Court in the context of a labor dispute in *Radio

Union v. Broadcast Service*, 380 U.S. 255, 257 (1965); *see

also Skidmore v. Precision Printing and Packaging, Inc.*,

188 F.3d 606, LEXIS 21886 **20 (1999); *Trevino v. Celanese

Corp.*, 701 F.2d 397 (5th Cir. 1983 (applying the *Radio

*Union* test in a civil-rights context); *Garcia v. Elf Atachem North America*, 28 F.3d 446, 450 (5th Cir. 1994). Factors considered in determining whether distinct entities constitute an integrated enterprise are (1) interrelation of operations, (2) centralized control of labor relations, (3) common management, and (4) common ownership or financial control (*Trevino*, 701 F.2d at 404). The Fifth Circuit has explained that the second of the four factors has been considered the most important factor (*Schweitzer v. Advanced Telemarketing Corp.*, 104 F.3d 761, 764 (5th Cir. 1997)).

25. In a Rule 12(b) context, Plaintiff's pleadings are more than sufficient to survive dismissal of UTSMF. In addition, if the Court is to consider evidence outside of the pleadings, the letter dated January 4, 2008, clearly demonstrating both parties' participation in the investigation by EEOC.

PRAYER FOR RELIEF

26. Plaintiff prays that the Defendants' Motion to Dismiss be denied. Plaintiff also prays that the Motion for Leave to Amend be granted and that Plaintiff's First Amended Complaint be ordered filed by the Court.

DATE:  March 21, 2009.

Respectfully submitted,

/s/ ANTHONY P. GRIFFIN
_____

ANTHONY P. GRIFFIN
ATTORNEY-IN-CHARGE

A GRIFFIN LAWYERS
1115 MOODY
GALVESTON, TEXAS  77550
409.763.0386
1.800.750.5034
FACSIMILE NO. 409.763.4102
EMAIL: agriffin@agriffinlawyers.com

TEXAS STATE BAR NO. 08455300
FEDERAL I.D. 4736

ATTORNEYS FOR PLAINTIFF
ANN MARIE ROSE BAKER, M.D.

CERTIFICATE OF SERVICE

This is to certify that on this the 21st day of March, 2009, the foregoing Plaintiff's Response to Defendants' Motion to Dismiss was forwarded to opposing counsel by electronic transmission, and/or, where noted, by certified mail, return receipt requested, to-wit:

SAM LIVELY
ASSISTANT ATTORNEY GENERAL
OFFICE OF THE ATTORNEY GENERAL – GREG ABBOTT
GENERAL LITIGATION DIVISION
P. O. BOX 12548, CAPITOL STATION
AUSTIN, TEXAS  78711

/S/ ANTHONY P. GRIFFIN
_____
ANTHONY P. GRIFFIN

c:word.baker.ann.response.motion.dismiss.2008.3068