```
          IN THE UNITED STATES DISTRICT COURT

          FOR THE SOUTHERN DISTRICT OF TEXAS

                    HOUSTON DIVISION

ANN MARIE ROSE BAKER, M.D.,
          PLAINTIFF,

V.                              CIVIL ACTION NO. 4:08-CV-1908

UNIVERSITY OF TEXAS HEALTH SCIENCE
CENTER – HOUSTON AND THE UNIVERSITY OF
TEXAS SYSTEM MEDICAL FOUNDATION,
          DEFENDANTS.
```

<u>PLAINTIFF, ANN MARIE ROSE BAKER, M.D.'S,
FIRST AMENDED COMPLANT</u>

Plaintiff, Ann Marie Rose Baker, M.D., hereinafter and sometimes referred to as Plaintiff, submits this her First Amended Complaint clarifying and stating with more particularity her allegations herein.  The Complaint is directed against the University of Texas Health Science Center – Houston (UTHSC-H), and the University of Texas System Medical Foundation (UTSMF), hereinafter and sometimes referred to as Defendants, the employers and/or UTHSC-H and UTSMF.  Plaintiff complains of discrimination and violation of her protected federal rights.  Plaintiff would show as follows, to-wit:

## Jurisdiction and Venue

1. Jurisdiction lies under the Americans with Disabilities Act, Title II and under the Rehabilitation Act of 1973 (Pub. L. 93-112; 29 U.S.C. 791, 794).

2. All matters material to this action occurred in Harris County, Texas.

3. Jurisdiction also vests under 28 United States Code Section 1331 (federal question), and 28 United States Code Section 1343 (civil rights).

4. Plaintiff has exhausted her administrative remedies and has received a Right to Sue letter from the Equal Employment Opportunity Commission (EEOC). The lawsuit was filed within ninety (90) days of receiving the Right to Sue.

## Parties

5. Ann Marie Rose Baker, M.D., at all times material to this action is and remains a resident of Harris County, Texas.

6. Baker is an American citizen who suffers from a disability as that term is defined by the Act.

7. The University of Texas Health Science Center - Houston (UTHSC-H) is an employer as that term is defined by federal law; alternatively, the University would be

2

considered a joint employer with the University of Texas System Medical Foundation.

8. University of Texas System Medical Foundation (UTSMF) is an employer as that term is defined by federal law and considered a joint employer of Plaintiff as that term is interpreted under the law.

9. Defendant(s) are the recipients of federal funds.

## Facts

10. Plaintiff is a graduate of medical school (University of Texas Medical School at San Antonio), having matriculated in 2003.  Plaintiff was accepted into the Pediatrics Residency Program at the University of Texas Health Science Center – Houston on or about September 1, 2003.

11. On April 15, 2003, Plaintiff entered an Appointment Agreement with the University of Texas System Medical Foundation (which served as the administrator of the University of Texas-Houston Health Science Center Medical School Affiliated Hospitals Integrated Residency Training Program during the calendar year 2003).  The Graduate Medical Education Handbook provided that "Resident Physicians pursuing their post-M.D./D.O. graduate training at the University of Texas Health Science Center Houston,

3

Medical School Affiliated Hospitals Integrated Residency Training Program … are appointed by the University of Texas System Medical Foundation."  In addition, the Handbook provides that UTSMF is organized to create an administrative focus for the conduct of the Integrated Residency Training Programs.

12.	As a Resident Physician, Plaintiff was required to serve at affiliated hospitals, accept the duties, responsibilities and rotations assigned by the Program Director, meet the Residency Training Program's standards for learning, and abide by the Rules and Regulations of the Board of Regents of UTSMF/UTHSC-H.

13.	UTSMF's role in the relationship between the parties was to issue paychecks, provide personnel services, maintain records and perform general administrative functions (staff and personnel for the administration of the Program).

14.	UTHSC-H was responsible for the assignment and appointment of residents in the program.  The appointment and continued appointment was subject to UTHSC-H's policies.  Reappointment to the Program was to be issued annually at the discretion of the Medical School Department Chairperson and Program Director, an employee of UTHSC-H.

15.  The level of responsibility accorded to each Resident Physician, as defined by policy, was determined by the Program Director and/or teaching staff.  Resident Physicians engaging in scientific research at UTHSC-H were responsible for maintaining the integrity of all research programs.

16.  All requests for leave of absence and accommodations were required to be approved by the Program Director.

17.  Determinations surrounding evaluations and advancement of residents were the responsibility of the Department Chairperson together with the Program Director and with input from members of the teaching staff.

18.  Plaintiff completed the residency program on or about September 30, 2007; however, Plaintiff complains that during her participation in the program she experienced discrimination based upon her disability; such discrimination violated Plaintiff's rights under federal law.

Disability as a Factor in Treatment and
Conditions of Employment

19.  On or about May 26, 2004, Plaintiff was admitted to the Huntsville Memorial Hospital and diagnosed with

5

viral meningitis.[1] On June 26, 2004, she was readmitted with Guillain-Barré Syndrome (GBS)[2] and for Intravenous immune globulin (IVIG) therapy.[3]

---

[1] "Meningitis is an infection of the fluid of a person's spinal cord and the fluid that surrounds the brain. People sometimes refer to it as spinal meningitis. Meningitis is usually caused by a viral or bacterial infection." *See Meningococcal Disease: Frequently Asked Questions*, Dept. of Health and Human Services, Center for Disease Control and Prevention (last updated May 28, 2008), citing information from the National Center for Immunization and Respiratory Diseases: Division of Bacterial Diseases, available at: www.cdc.gov/meningitis/bacterial/faqs.htm.

[2] "Guillain-Barré syndrome is a disorder in which the body's immune system attacks part of the peripheral nervous system. The first symptoms of this disorder include varying degrees of weakness or tingling sensations in the legs. In many instances, the weakness and abnormal sensations spread to the arms and upper body. These symptoms can increase in intensity until the muscles cannot be used at all and the patient is almost totally paralyzed. In these cases, the disorder is life-threatening and is considered a medical emergency. The patient is often put on a respirator to assist with breathing. Most patients, however, recover from even the most severe cases of Guillain-Barré syndrome, although some continue to have some degree of weakness. Guillain-Barré syndrome is rare. … Guillain-Barré is called a syndrome rather than a disease because it is not clear that a specific disease-causing agent is involved. Reflexes such as knee jerks are usually lost. Because the signals traveling along the nerve are slower, a nerve conduction velocity (NCV) test can give a doctor clues to aid the diagnosis. The cerebrospinal fluid that bathes the spinal cord and brain contains more protein than usual, so a physician may decide to perform a spinal tap." *See NINDS Guillain-Barré Syndrome Information Page,* National Institutes of Health, National Institute for Neurological Disorders and Stroke, available at: http://www.ninds.nih.gov/disorders/gbs/gbs.htm.

[3] "There is no cure for Guillain-Barré syndrome. However, many treatments are available to help reduce symptoms, treat complications, and speed up recovery. When symptoms are severe, the patient will need to go to the hospital for breathing help, treatment, and physical therapy. A method called plasmapheresis is used to clean a person's blood of proteins called antibodies. Blood is taken from the body, usually from the arm, pumped into a machine that removes the antibodies, then sent back into the body. High-dose immunoglobulin therapy (IVIG) is another procedure used to reduce the severity and length of Guillain-Barré symptoms."

6

20. Doctors at The Institute of Rehabilitation and Research (TIRR), Baylor College of Medicine, repeatedly explained to Defendants that Plaintiff's condition required energy conservation measures and accommodations with work and activities of daily living.

21. Dr. Kate Hughes, PT, DPT, MS., OCS, Doctor of Physical Therapy and Board certified Orthopedic Clinical Specialist, TIRR, listed the physical work accommodations to include:

1. No standing or walking for > 10 min. continuously.
2. Use of a wheelchair at work.
3. No continuous upper extremity activities.  She is able to check off forms & write short notes, but requires accommodations for longer notes (i.e. dictation).
4. Requires 15-minute rest breaks every two hours.  She may use this time to eat snacks, as her energy expenditure to perform routine task is high.  She requires increased caloric intake to meet or exceed her energy demands.
5. Limited work day to – 4 hours/day (5 day/week).
6. Must be able to attend medical follow up and rehabilitation appointments on a regular basis.

---

Intravenous immune globulin (IVIG) is a blood product administered intravenously.  It contains the pooled antibodies extracted from the plasma of over one thousand blood donors.  IVIG's effects last between two (2) weeks and three (3) months.  It is mainly used as treatment in three major categories: immune deficiencies, inflammatory and autoimmune diseases, and acute infections.

"Other treatments are directed at preventing complications. Blood thinners may be used to prevent blood clots.  If the diaphragm is week, breathing support or even a breathing tube and ventilator may be needed.  Pain is treated aggressively with anti-inflammatory medicines and narcotics, if needed. Proper body positioning or a feeding tube may be used to prevent choking during feeding if the muscles for swallowing are weak.  See *Guillain-Barré Syndrome*, Northwestern Memorial Hospital (reviewed June 4, 2008), at: http://www.nmh.org/nmh/adam/adamencyclopedia/HIE Articles/000684.htm; citing *Intravenous immunoglobulin for Guillain-Barré Syndrome*, Hughes RA, Raphael JC, Swan AV, van Doorn PA. (Cochrane Database System Rev. January 25 2006;(1):CD002063 Review.).

22. Plaintiff did not return to her residency duties until September 2004; her return was accompanied by restrictions imposed by her physician.  The restrictions were accepted by the Defendants; however, as noted herein, the oral and/or written acceptance was not followed in practice.

23. On November 25, 2004, Plaintiff was admitted to Montgomery County Memorial Hospital (MCMH) with over-use nerve re-injury syndrome and for inpatient rehabilitation.

24. On November 25, 2004, Plaintiff was admitted to TIRR for extensive inpatient rehabilitation for Guillain-Barré Syndrome.

25. In April of 2005, Plaintiff began intensive outpatient therapy through TIRR's Comprehensive Day Work Program.  She returned to residency duties in July with restrictions which were accepted by Dr. Sharon Crandell, the Program Director.  The restrictions had been modified due to Plaintiff's improvements in physical and occupational therapy.

26. Defendants received a Letter Of Medical Necessity dated October 3, 2005, from Dr. Teresa Kaldis, TIRR Director of Specialty Rehabilitation Program, Co-Director Post Polio Clinic, and Assistant Professor of Physical

Medical and Rehabilitation, Baylor College of Medicine, recommending that Plaintiff receive special accommodations for testing (four (4) days of four (4) hour testing with a thirty (30) minute break every two (2) hours).

27.   On May 29, 2006, Dr. Hughes provided the following update on Plaintiff's restrictions to Dr. Crandell:

> Dr. Baker continues to be limited by severe fatigue.  This is an extremely common sequela of GPS and is well documented in medical literature (Corsi and Versino, Gregory et al, Merkies et al). Merkies represented that severe fatigue was present in most people (`80%) who previously had GBS despite normal strength and sensation on testing.

Dr. Hughes explained that fatigue would be an issue needing to be managed for the foreseeable future; and that the already tremendous demands of residency increase exponentially "when combined with the serious fatigue of GBS."  She listed the steps Plaintiff had taken to decrease household activities and conserve energy while completing her residency, and noted that activity outside of work and home had been minimized.  The requested work accommodations based on the most recent assessment were significantly reduced:

> 1.   No standing or walking for > 20-30 min continuously (maximum total of standing/walking 2 hrs/work day).
> 2.   Use of a wheelchair at work.

9

    3.    Use of dictation, voice recognition software, or a scribe to write notes.
    4.    Requires 15 min rest/food breaks every 4 hours (requires increased caloric intake due to body's high energy expenditure, even when function at low level).
    5.    Requires greater recovery time after call nights, if not possible to obtain at least 4 hrs sleep on call nights. Consider designating day after the day after the call night as Dr. Baker's day off to allow recovery from fatigue.

28. In her March 28, 2007, update/accommodations letter, Dr. Hughes explained: "after approximately eight months without formal physical therapy from 12/05 to 8/06, Dr. Baker resumed therapy in September of 2006, subsequent to injuries sustained in an accident." Dr. Hughes believed Plaintiff's recovery was slowed due to her disability. For example, Plaintiff continued to have swelling in her left foot and bilateral lower legs up to her knees despite repeated MRIs and X-rays revealing no orthopedic problem responsible for the swelling.

29. Dr. Hughes noted Plaintiff's significant progress which had almost eliminated her wheelchair use. However, upper extremity weakness and fatigue continued to be problematic. The only accommodations requested at that time were "fatigue management strategies … Rest and caloric intake to meet energy expenditures … Recovery time after on-call nights is still necessary, and Dr. Baker needs opportunities to eat throughout the day. These

10

accommodations will help decrease the effects of fatigue on her work performance."

## Violation of Federally Known Rights

30. Plaintiff suffers from a disability that is permanent, but that she has lived with admirably, performing at a high level consistent with the intent of the Act.

31. Plaintiff was able to perform the essential functions of her job, but needed accommodation in light of the weakness associated with her disability.

32. Title II of the ADA provides, that "no qualified individual with a disability shall by reason of such disability, be excluded from participation in or be denied the benefits of the service, program, or activities of a public entity, or be subjected to discrimination by any such entity.  42 U.S.C. § 12132.

33. A "qualified individual with a disability" is defined as "an individual with a disability who, with or without reasonable modifications of rules, policies, or practices, the removal of architectural, communication or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in

programs or activities provided by a public entity." 42 U.S.C. § 12131(2).

34. <u>Direct comments</u>.  Plaintiff was told on more than one occasion that she was faking and/or malingering.  These statements were made by the Program Director, Dr. Crandell.  On one occasion, Dr. Crandell informed Plaintiff that she had learned that Plaintiff was out dancing, with the implication that Plaintiff was not suffering from any disability.  Plaintiff was wheel-chair bound at the time.

35. In addition, the expression Dr. Crandell would oft-times use was that Plaintiff was "weaseling out of work".  Crandell's statement originated from Dr. Mesfin Woldensenbet and Dr. Cea Tillis, who in April of 2006 were not respecting Plaintiff's ability, disabilities, or restrictions, and made clear that they felt Plaintiff was weaseling out of her work and using her disabilities as an excuse.  Plaintiff complained to the Administration at this time about the statements.  The result of the complaint would later surface in another form.

36. Accommodations prescribed by TIRR were refused.  In addition, it came to Plaintiff's attention that from January 2007 through April 2007 the Director was informing others in staff meetings that Plaintiff had failed a

rotation and would not complete the program on time. Plaintiff had not failed any such rotation.

37. In January 2007, the Program Director began to challenge Plaintiff's competency and ability to work independently. It is Plaintiff's position that this originated from Plaintiff's insistence that her restrictions and accommodations be honored.

38. In April 2007, Plaintiff was told by Dr. Crandell that she would be required to remediate the first rotation, for the calendar year 2006, even though Plaintiff had not failed the rotation. When Dr. Michelle Barrett, Assistant Program Director, inquired of Dr. Mesfin Woldesenbet whether Plaintiff failed the 2006 rotation and whether she had to remediate the rotation, Dr. Woldesenbet stated that Plaintiff had not failed, and denied saying she had.

39. On April 21, 2007, Plaintiff was pulled off the rotation by the Program Director; Plaintiff was told that she was medically incompetent and it was unsafe for her to continue. The medically incompetent label was applied because Plaintiff sought modification of the policies and practices of the institution. Specifically, on April 23, 2007, Dr. Crandell wrote a note to the file of Plaintiff, saying that based on an alleged review of Plaintiff's

13

performance with Dr. Tsakiri, "Ann Marie is currently functioning at a very low level."  And "I have placed her on medical leave of absence with instructions to see several professionals."

40.  The several professionals were listed in an email from Dr. Crandell to Plaintiff the following day, and included Dr. Vernon Walling, "a competent Child/Adult Psychiatrist who has considerable experience working with patients with ADD, … a competent internist to evaluate your overall health," and Pam Bass who "is very enthusiastic about your seeing Dr. Walling … ."  Plaintiff was required to spend the rest of the month reading.  She would not receive credit for passing the month.  The email was prefaced: "Dr. Barratt has informed me that my expectations for you for the rest of this month were not clear.  You have been relieved of your medical duties at LBJ."

41.  It is Plaintiff's position that pulling Plaintiff off the rotation was a continuation of Defendants' reaction to Plaintiff's disability and related accommodations.  In fact, the requirement that Plaintiff visit a psychiatrist was tantamount to labeling the disability as "defective" and/or "its all in your head."

42. On July 1, 2007, in a submission to the Texas State Board of Medical Examiners, Dr. Crandell wrote, "after review of Dr. Baker's full training history it has come to light that she actually needs to make up three rotations from time missed during her illness. This was miscalculated when we reported this in February 2007. Please extend her current permit to expire on 9.30.07. This will allow her to meet the ABP training requirements." The statement of miscalculation was false, as was the statement that Plaintiff had missed three rotations.

43. It has come to Plaintiff's attention that others in the residency program were subject to the same type of disparate treatment by the Program Director (request for accommodation associated with high-risk pregnancy). This hostility took the form of calling the resident(s) names (lazy), being highly critical of work product, and nit-picking.

44. <u>Adverse action and pretext</u>. Plaintiff was required to extend her residency for the months of June, July, August, and September 2007. The initial reason proffered was failure of the rotation; the second reason proffered was competency; the third reason – "a miscalculation of time."

PRAYER FOR RELIEF

45. Plaintiff prays for:

    A.    Equitable relief including the award of back pay and front pay, and benefits lost but for the discriminatory conduct;

    B.    Equitable relief on the finding of discrimination, requiring the institution to provide a positive reference to any examining board and/or any future employer;

    C.    Compensatory damages incurred in the past, present and future;

    D.    Attorneys' fees reasonably incurred in the prosecution of this matter.

    E.    Pre-judgment and post-judgment interest;

    F.    Equity relief with respect to future acts and that the Defendant, its employees and assigns, be enjoined from engaging in acts in violation of Federal anti-discrimination laws (*see* (b) above);

    G.    Costs of court.

46. Plaintiff also prays for all relief in equity and under law to which she may be deemed entitled.

DATE:  March 21, 2009.

        Respectfully submitted,

        /S/ ANTHONY P. GRIFFIN
        _____

        ANTHONY P. GRIFFIN
        ATTORNEY-IN-CHARGE

        A GRIFFIN LAWYERS
        1115 MOODY
        GALVESTON, TEXAS   77550
        409.763.0386
        1.800.750.5034
        FACSIMILE NO. 409.763.4102

        TEXAS STATE BAR NO. 08455300
        FEDERAL I.D. NO. 4736

        ATTORNEYS FOR PLAINTIFF
        ANN MARIE ROSE BAKER, M.D.

**A JURY TRIAL IS DEMANDED**

c:word.baker.ann.first_amended_complaint.2008.3068

CERTIFICATE OF SERVICE

This is to certify that Plaintiff's First Amended Complaint was forwarded to all counsels of record by electronically filing same on this the 21st day of March, 2009 and/or by forwarding the document by certified mail, return receipt requested wherein noted, to-wit:

```
              SAM LIVELY
       ASSISTANT ATTORNEY GENERAL
       OFFICE OF THE ATTORNEY GENERAL
         GENERAL LITIGATION DIVISION
     P. O. BOX 12548, CAPITOL STATION
            AUSTIN, TEXAS  78711
```

/S/ ANTHONY P. GRIFFIN
_____

ANTHONY P. GRIFFIN